**UNITED STATES v. GILLETTE.**

**No. 154, Docket 21879.**

United States Court of Appeals
Second Circuit.

Argued Feb. 5, 1951.

Decided April 11, 1951.

Rehearing Denied June 4, 1951.

Vine H. Smith, Brooklyn, N. Y., Nathan B. Kogan and Otho S. Bowling, New York City, of counsel, for appellant.

Irving H. Saypol, U. S. Atty., New York City, Bruno Schachner, Roy M. Cohn and Stanley D. Robinson, Assts. U. S. Atty., all of New York City, of counsel, for appellee.

Before L. HAND, Chief Judge and SWAN and FRANK, Circuit Judges.

SWAN, Circuit Judge.

This appeal brings up for review a judgment of conviction upon counts 8, 9 and 10 of an indictment charging illegal transportation in interstate commerce of counterfeit American Express Company checks in violation of 18 U.S.C.A. § 2314, and conspiracy to transport them in violation of 18 U.S.C.A. § 371. The transportation charged in count 8 was from the Southern District of New York to Chicago, Illinois, and that charged in count 9 from the Southern District of New York to Los Angeles, California. On each of these counts the appellant was fined $7500 and sentenced to ten years' imprisonment to be served consecutively. On the conspiracy count the sentence was five years' imprisonment to run concurrently with the ten year terms, and a fine of $5,000. Thus, in the aggregate, the sentence was 20 years imprisonment and $20,000 in fines. The appeal challenges the sufficiency of the evidence, raises a question of jurisdictional venue, and assigns errors in the charge to the jury and in the admission of evidence.

The Government's case, made in large part by the testimony of co-defendants who pleaded guilty and testified for the prosecution, proved the existence of a criminal conspiracy pursuant to which two Manhattan printers counterfeited $420,000, face value, of American Express Company travelers checks in denominations of twenty, fifty and one hundred dollars, and de-

livered the counterfeits in Manhattan during July 1949 to Faucella, a co-defendant who became a fugitive from justice before the trial. It was also proved that the conspirators engaged "teams" of check passers who cashed a large number of the counterfeit checks in various cities throughout the country, and that the checks were transported in interstate commerce before they were cashed. None of the foregoing is disputed by the appellant. What he disputes is the sufficiency of the evidence to establish his participation in the criminal enterprise. It is true that there is nothing to connect him with it prior to the meeting on August 19, 1949, as to which Edward Larigan testified. That meeting took place in a restaurant in Manhattan. At the table were several of the conspirators and also Gillette. Larigan testified that the group discussed various possible locations, including Havana, in which to begin the cashing of the counterfeit checks; that Gillette disapproved Havana, and, after Chicago was finally agreed upon, said he wanted to go to Chicago "to supervise this thing" but could not go with the others and would join them there later. Larigan also testified that the day after his arrival in Chicago he received a long distance telephone call from Gillette in New York, asking if "everything was all right," and inquiring for Di Palermo's Chicago hotel address and room number. The next day Gillette arrived in Chicago, and took a room under an assumed name at the same hotel at which Di Palermo was staying. Later when the conspirators moved on to Los Angeles Gillette accompanied them, purchasing an air plane ticket under an assumed name. Without the necessity of reciting further details of the testimony, we think it obvious that the jury was amply justified in finding that the appellant became a member of the conspiracy.

The next question is whether Gillette could be indicted and tried in the Southern District for a transportation to Chicago which began in the Eastern District. As previously stated, the counterfeits were delivered by the printers in Manhattan, but there is no evidence that they were within the Southern District when their interstate transportation to Chicago was planned at the meeting on August 19th. So far as appears they may then have been in Brooklyn, where, two days later Joseph Di Palermo got them before boarding the plane at La Guardia Field which is also in the Eastern District. How or when the counterfeits were carried from Manhattan to Brooklyn was not shown. Count 8 of the indictment charged transportation "from the County, City, State and Southern District of New York, to the City of Chicago." Since the prosecution proved only a transportation from Brooklyn to Chicago the appellant argues that there is a fatal and jurisdictional variance between the allegations and the proof. This argument fails to recognize that Gillette became an accessory in Manhattan on August 19th to the later transportation to Chicago, because at the meeting in the restaurant he counselled, aided and abetted it.[1] Since Gillette neither transported the checks nor was present at their transportation, by the common law rule as we inherited it he would be triable only as an accessory,[2] and only in the district where the accessorial acts took place.[3] The statute cited in note 1 makes an accessory a principal so that it is now possible to try him where the substantive offense was committed.[4] But this, in our opinion, does not supersede the common

---

1. Section 2, 18 U.S.C.A., provides: "(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal.

"(b) Whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such."

2. People v. Lyon, 99 N.Y. 210, 1 N.E. 673;

People v. Hodges, 27 Cal. 340; 1 Wharton, Criminal Law, 12th ed., § 263.

3. People v. Hall, 57 How.Pr., N.Y., 342; State v. Chapin, 17 Ark. 561; Johns v. State, 19 Ind. 421; State v. Moore, 26 N.H. 448; State v. Wyckoff, 31 N.J.L. 65. See 2 and 3 Edw. VI, c. 24, § 4 (1548), repealed by 7 Geo. IV, c. 64, § 32 (1826).

4. See Eley v. United States, 6 Cir., 117 F.2d 526, 528.

law rule of venue but provides an additional venue. Similarly, we construe 18 U.S.C.A. § 3237 as broadening, not reducing, the venue jurisdiction inherited from English law.[5] Accordingly we hold that indictment and prosecution of Gillette in the Southern District for the offense charged in count 8 was proper.

As to count 9 the opposite result is required. No accessorial acts with respect to transportation of any of the checks to Los Angeles were committed by Gillette in the Southern District. Had it been agreed in Manhattan that part of the checks would be transported to Chicago and part to Los Angeles, two crimes would have been contemplated and he could have been held as an accessory to each; but there was no such evidence. So far as appears the plan to move on to Los Angeles was not conceived until Larigan's defection in Chicago. Any accessorial act of Gillette took place there. The judgment and sentence on count 9 must be reversed.

We pass now to the trial court's charge. The jury was instructed that the crime was that of transporting the checks "from the State of New York to other states," and this was immediately followed by an adequate instruction on aiding and abetting. But the jury was not told that it had to find some act of aiding and abetting in Manhattan in order to convict on the substantive counts. This was error, for under the Sixth Amendment proof of venue is an indispensable part of the prosecution's case.[6] The only question is whether the error was so grave as to require reversal of the conviction on count 8. We think it was not. The only direct testimony linking Gillette with the transportation from New York to Chicago came from Larigan who testified as to Gillette's conduct at the meeting on August 19th, to his long distance telephone call from New York, and to his presence and conduct in Chicago. Larigan's testimony was fortified by the testimony of others who told of Gillette's trip to Los Angeles and of his agreement with Joseph Di Palermo's statement that if things had gone as expected, Gillette would have been in position to help him but as it was he would not. Such testimony corroborated Larigan generally, and not alone as to what he said of Gillette's conduct in Chicago. Consequently, if the error requires reversal, it can only be because, although the jury believed what Larigan said of Gillette's actions in Chicago, they might not have believed Larigan's testimony as to the part Gillette took in the meeting of August 19th. This seems so highly improbable that we think the failure to give the instruction could not have affected the verdict and was a non-prejudicial error.

With respect to alleged errors in the admission of evidence little need be said; none has merit. Joseph Di Palermo's statement to Larigan, not in the presence of Gillette, that Larigan had nothing to worry about and that "Gillette was backing the deal," was properly admissible as a statement made to encourage Larigan, newly admitted to the conspiracy to act as a check passer.[7] Evidence of Gillette's participation in the conspiracy was already in, and whatever prejudice Gillette might have suffered was cured by the court's instruction to the jury that a statement of this character "was not to be used as proof of the existence of the conspiracy" but was only relevant as a fact occurring in furtherance of it, if the conspiracy was found to exist. Rose Lopicollo's testimony that Gillette approved Di Palermo's statement in his presence that if the affair had succeeded as planned, Gillette would have been in a better position to help, was properly admitted as an admission by Gillette. Complaint is also made of the admission of Di Palermo's warning to Rose Lopicollo to conceal her visit to Gillette's house during her New York trip. It is argued that the

5. Cf. United States v. Monjar, D.C.Del., 47 F.Supp. 421, 428, affirmed, 3 Cir., 147 F.2d 916, certiorari denied 325 U.S. 859, 65 S.Ct. 1191, 89 L.Ed. 1979.

6. United States v. Zeuli, 2 Cir., 137 F.2d 845, 847; Moran v. United States, 6 Cir., 264 F. 768, 770; United States v. Jones, 7 Cir., 174 F.2d 746, 748; see also United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236.

7. See United States v. Chiarella, 2 Cir., 184 F.2d 903, 907.

warning was not given until after the conspiracy had ended, and was therefore inadmissible.[8] The last conspiratorial transaction—a balancing of accounts with a member of the conspiracy—occurred two or three weeks after the Los Angeles operation had been concluded. The record does not show whether Di Palermo's admonition to Rose came within this period. However that may be, the appellant did not object at the time of its admission in evidence. He now attempts to rely on a "continuing objection" made nearly two hundred record pages earlier, when Larigan was being examined. That objection was not made on the ground now urged.

Judgment on counts 8 and 10 affirmed; judgment on count 9 reversed.

### On Petition for Rehearing

SWAN, *Circuit Judge*.

Three separate grounds for granting a rehearing are asserted in the petition. The petition is denied as to grounds one and three. The court requested the United States Attorney to file a memorandum in answer to the second ground. He has done so and counsel for the petitioner has filed a memorandum in reply.

 Our former opinion stated that "the jury was not told that it had to find some act of aiding and abetting in Manhattan in order to convict" on count 8 of the indictment which charged transportation of the counterfeit checks from New York to Chicago. We said that the failure to give such a charge was error but was nonprejudicial, because it was so highly improbable that the jury did not believe Larigan's testimony as to the part Gillett took in the meeting at the restaurant in Manhattan on August 19th that failure to give the charge could not have affected the verdict. The petitioner contends that our ruling upon the charge was in effect an original finding of fact by this court that Larigan's testimony as to the August 19th meeting was true and that Gillette's participation in that meeting made him an abettor of the transportation. The United

States Attorney replies that to state the problem in terms of probabilities, as the court did, unduly favored Gillette because under the charge as given the jury necessarily found that he abetted in Manhattan the interstate transportation to Chicago. Further study of the charge convinces us that the United States Attorney is right.

The jury was instructed that the substantive offense was "the transporting or causing these counterfeit checks to be transported in interstate commerce, that is, from one state to another * * *" (fol. 2259). "The charge here is * * * [that] they were carried from the State of New York to other states * * *" (fol. 2260). The court then charged that such transportation is a crime only if "the party charged knew" that the checks were counterfeit and that "they were to be transported" (fol. 2261). Then followed immediately an instruction on aiding and abetting: "In this case the charge of transportation, of course, will include causing to be transported or aiding or abetting. It is not necessary for a jury to find that A himself picked up a forged or counterfeit paper * * * and himself carried it * * * from New York to Chicago * * * But if he caused it to be done or aided or abetted in it, then he is equally as guilty as the person who carried the paper * * * In other words, ladies and gentlemen, one may act through another. I may scheme or devise to commit a crime and I may have you carry some of it out, and you and I are both guilty provided I actually knew and took part in causing you to take the securities from one state to another * * *" fols. 2261–3). The court then said that "The eighth count of this indictment applies to the defendant Gillette" and shortly thereafter, at fol. 2279, stated that the question is not "whether there was a scheme, because those facts are well-established. * * * But the question for you is whether George Gillette and Thomas Polo were guilty as charged in connection with the transportation from New York to Chicago for the purpose of cashing, as described to you."

---

8. See Krulewitch v. United States, 336 U. S. 440, 69 S.Ct. 716, 93 L.Ed. 790; Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196.

454

Under these instructions the jury could not have convicted Gillette on count 8 unless they found that he aided and abetted the transportation from New York to Chicago and the only evidence of his participation in the scheme prior to the arrival of the checks in Chicago was Larigan's testimony as to what occurred at the meeting in Manhattan on August 19th. Hence the jury must have believed this testimony, unless they disregarded the instructions, which we may not assume. Since the transportation to Chicago had been completed when Gillette telephoned Larigan in Chicago, neither the telephone talk nor the evidence as to Gillette's acts in Chicago and Los Angeles, could itself be an aiding or abetting of the transportation, although it might well have been taken as strongly confirmatory of Larigan's testimony as to Gillette's aiding and abetting at the August 19th meeting. For the foregoing reasons, we do not think Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350, upon which the petitioner relies, is controlling.

Petition denied.